**UNITED STATES of America,**
**Appellee,**

v.

**Donald Grant GIBSON, Appellant.**

**No. 11624.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 9, 1968.

Decided March 1, 1968.

Edward W. Hiserman, Charleston, W. Va. (Court-appointed counsel), for appellant.

W. Warren Upton, Asst. U. S. Atty. (Milton J. Ferguson, U. S. Atty., and Charles M. Love, III, Asst. U. S. Atty., on brief), for appellee.

Before SOBELOFF and BOREMAN, Circuit Judges, and KELLAM, District Judge.

SOBELOFF, Circuit Judge:

Appealing from a conviction of knowingly transporting a stolen vehicle in interstate commerce in violation of 18 U.S.C. § 2312, the appellant contends that the trial court erred in two evidentiary rulings, thereby violating his constitutional rights. The first ruling complained of is that the court permitted a trooper of the West Virginia State Police to testify concerning a certain sidewalk conversation he had with the appellant. The second is that the court admitted in evidence an automobile registration card surrendered by the appellant to the officer in the course of that conversation.

The contention is predicated on the police officer's failure to advise the appellant, Gibson, that he had the right to remain silent and that anything he said might be used as evidence against him. Although Gibson does not claim that he had been put under formal arrest at the time of the conversation, he urges that under Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the duty to inform a suspect of his Fifth Amendment rights extends to the instant situation, which he maintains was the equivalent of a police detention. We disagree and hold that the warnings were not due and that the challenged evidence was properly admitted.

On the evening of March 7, 1967, Trooper Greathouse received an anonymous tip that the appellant was driving a 1965 white Chevrolet Impala which the informant believed had been stolen. The informant further described the car as bearing Indiana license plates 73C826. Greathouse then contacted Indiana authorities and was informed that the plates were registered in that state to one Jerry McKenny and had recently been "lost or stolen." On the strength of this tip and partially, but not wholly, cor-

roborating report from Indiana, state police officers began a hunt for the car. They located it the same evening in front of a beer tavern in Cedar Grove, West Virginia. Entering the tavern and finding Gibson seated at a table, Officer Greathouse asked him to step outside. Once outside, the appellant and the officer engaged in a brief conversation. The trial transcript of Officer Greathouse's testimony is as follows:

"I asked him where he lived at and so forth and he stated there in Cedar Grove he was staying with his brother. I asked him how long he had been in Cedar Grove. He said a few days.

"I asked him if he owned a car. He said no. I said, 'How did you get from Indiana to Cedar Grove?' He said, 'By bus.' I said, 'Do you work in Indiana?' He said, 'Yes, I did.' I said, 'Do you own this white car sitting here?' and he said, 'No.'

"About that time he said, 'Well, there's no use to lie to you.' He said, 'That is my car.' So I said, 'You say that's your car?' and he says, 'Yes.'

"He pulled out this registration slip and hands it to me, which was registered, the same vehicle, 1965 Chevrolet, same serial number was marked on this registration slip."

Greathouse further testified that since it was apparent at a glance that the slip had been altered, he placed a second call to Indiana only to learn the Indiana police had no record of a stolen car matching the description or serial number of the one the appellant was driving. Greathouse then arrested Gibson for drunkenness, and, for the first time, advised him of his constitutional rights. During the drive to the county jail, the police received a message that the car had been reported stolen in Cleveland, Ohio. At trial no testimony was offered

as to any statements made by Gibson after the arrest, if indeed he made any such statements.[1]

To bring his case within the rule of Miranda v. State of Arizona, supra, Gibson argues that when the officer asked him to step outside, he would have been forcibly restrained had he attempted to leave and that he was in effect in police custody. From this premise he concludes that the questioning conducted on the sidewalk in front of the tavern constituted "custodial interrogation," within the meaning of Miranda, supra, and that any statement made during the interrogation should be held inadmissible.

"Custodial interrogation" was defined by the Supreme Court as:

" * * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

In holding that one subjected to "custodial interrogation" must first be warned of his Fifth and Sixth Amendment rights, the Court sought to safeguard these rights for individuals placed by the police in an inherently coercive environment inducing a feeling of compulsion to answer questions. The purpose was to preserve the right " 'to remain silent unless [the person] chooses to speak in the unfettered exercise of his own will.' Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)." Miranda, supra at 460, 86 S.Ct. at 1620.

In Miranda, the primary concern of the Court was with the "potentiality of compulsion" interent in in-custody interrogations. The Court spoke of that case as one in which "[a]n individual is swept from [his] surroundings into police custody," [2] "thrust into an unfamiliar atmosphere," [3] held incommunicado,[4] "surrounded by antagonistic forces," and

1. If the arrest were pretextuous, we would not condone it; but since there appears to have been no custodial interrogation after the arrest, we have no occasion to give further consideration to this aspect of the case.

2. 384 U.S. at 457, 86 S.Ct. at 1621.

3. 384 U.S. at 461, 86 S.Ct. 1602.

4. 384 U.S. at 445–446, 86 S.Ct. 1602.

"run through menacing police interrogation procedure."[5] This is not such a case.

"Custodial interrogation" certainly includes all station-house or police-car questioning initiated by the police, for there the "potentiality for compulsion" is obvious. Whether it also reaches police inquiries made of a suspect on the street or at his own home was left unanswered by the Court and has been much debated. See People v. Allen, 50 Misc.2d 897, 272 N.Y.S.2d 249 (1966); People v. P. (Anon.), 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (11/30/67); Kamisar, Developments in Criminal Law in Proceedings, Eighteenth Annual Meeting of the Conference of Chief Justices 42 (1966). Precise refinements of the terms "custody" and "interrogation" will have to be developed on a case-by-case basis. Thus, our present task is to determine whether the atmosphere surrounding the brief police questioning on the sidewalk near the car was characterized by "official overbearing" or "overzealous police practices" which, as the Court pointed out, could preclude the individual's making a rational decision whether to speak to the police or remain silent.

▮ This court does not read *Miranda* as requiring officers to preface with a warning all non-coercive questioning conducted in the course of a routine investigation as in the circumstances of this case. See Allen v. United States, 390 F.2d 476 (D.C.Cir. 1/25/68). Not until the suspect has been taken into custody or restrained in a significant way do the *Miranda* requirements attach.

The uncontroverted evidence indicates beyond doubt that Gibson, at the time of the conversation, was not in custody or significantly restrained, or in any other way deprived of his free will. Trooper Greathouse simply asked Gibson to step to the sidewalk, and pointing to the car parked in front of the premises, asked him if it was his. At first denying ownership, Gibson quickly reversed course and, without any pressure from the officer, voluntarily produced the document intended to prove his ownership. It was at this point that Greathouse noticed the alterations which led him to check further with the Indiana authorities. When Gibson was asked if the car belonged to him, the trooper knew only that the license tags had been "lost or stolen," and that the car *might have been* stolen. In the then amorphous situation, inquiry was indicated but not enough was known by the officers to conclude that the car had in fact been stolen, or that Gibson was the guilty party. When the police talked with him on the sidewalk they seemingly had not formed an intention to arrest him. Even after the voluntary production of the altered document the officers apparently did not feel that the situation warranted his arrest for stealing the vehicle.

▮ Gibson, who took the stand, offered no different version. In the complete absence of the element of coercion, actual or potential, or police dominance of the individual's will, the mild police activity shown here should not prevent the introduction of statements freely made. The evils with which the Court was concerned in *Miranda* are not present here. Nor do we perceive in the record any element of accusation, deception, suggestion, or other tactics calculated to overawe, like those condemned in *Miranda,* supra 384 U.S. at 448–456, 86 S.Ct. 1602. Significant in the instant case are the short duration of the questioning, which lasted no more than a few minutes; the very casual, reasonable and routine manner in which it was conducted; and the absence of any apparent purpose either to force or to trick the suspect into an admission of guilt.

The judgment of the District Court is

Affirmed.

5. 384 U.S. at 457, 86 S.Ct. at 1618.