**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Glenn W. HALL, Defendant-Appellant.**

**No. 239, Docket 33692.**

United States Court of Appeals
Second Circuit.

Argued Nov. 4, 1969.

Decided Dec. 15, 1969.

Certiorari Denied March 23, 1970.
See 90 S.Ct. 1123.

James P. Shanahan, Asst. U. S. Atty. (James M. Sullivan, Jr., U. S. Atty. for the Northern District of New York, Syracuse, N. Y., of counsel), for plaintiff-appellee.

William B. Mahoney, Buffalo, N. Y. (John B. Corcoran, Buffalo, N. Y., of counsel), for defendant-appellant.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal from a conviction for bank robbery, 18 U.S.C. § 2113(a), vindicates the observation by a penetrating scholar: "Probably the most difficult and frequently raised question in the wake of [Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] is what constitutes the 'in-custody interrogation' or 'custodial questioning' which must be preceded by the *Miranda* warnings." [1]

The bank robbed was the Cicero, N. Y., branch of The Merchants National Bank & Trust Co. of Syracuse. At approximately 7:55 A.M. on Thursday, December 12, 1968, Mrs. Richer, the head teller, parked her automobile at the rear of the bank. Approaching it, she sensed she was being followed. A man wearing a stocking mask over his face and carrying a rifle directed her into the bank. He herded Mrs. Richer, Mr. Corbett, the assistant manager, and two other tellers into a vault. There he instructed Mrs. Richer to put the cash, $37,872.-44, into a bag and give him the keys to her car. He then made his exit. Later Mrs. Richer saw her car in the parking lot of a bowling alley some 100' away from the back parking lot of the bank.

Unfortunately for the robber, an observant young lady, Barbara Costick, had driven onto the bowling alley parking lot around 7:45 A.M. She saw a maroon or red colored car backed up against the edge of the parking lot and facing the rear of the bank. After letting off her brother Stanley, who worked in the bowling alley, she noticed that the man in the car was wearing a gray hat and topcoat—a description of the robber's costume generally tallying with Mrs. Richer's. As Miss Costick drove by, the man put his left arm up to the window to shield his face. She was sufficiently struck by this conduct to look at the license plate and, after driving a hundred yards or so and coming to a stop, to write down on a card the number—OA 1587. About five minutes later, Stanley Costick noticed that the red car, which he identified as a Chevrolet, had moved to the other side of the parking lot closer to the bank. Later observation of footprints in the snow by a county sheriff made it evident that the robber had walked from this position up to the bank parking lot and had returned to the same position from Mrs. Richer's car.

The license number was speedily traced to the Syracuse office of Employers Insurance Co. of Wausau. Investigation there showed that a Chevrolet car bearing that number had been assigned to defendant Hall, who had been a sales trainee in the Syracuse office but had later been transferred to Buffalo.

1. Kamisar, "Custodial Interrogation" within the Meaning of *Miranda*, in Criminal Law and the Constitution 335 (1968).

At 4:22 P.M. Special Agent Schaller and two other F.B.I. agents arrived at Hall's apartment in North Tonawanda, N. Y. The apartment, in the rear of the first floor of a three family dwelling, was a small one, with a living room some 12′ x 14′ furnished with a couch and two chairs, a kitchen, a bedroom and bath. After identifying himself and his companions, Schaller told Hall they would like to come in and speak to him. He said they were welcome. Schaller related that a bank near Syracuse had been robbed that morning, that a car tallying Hall's in description and license number had then been observed nearby, and that he would like to talk to Hall about the latter's activities during the week of December 9 to 12.

Hall stated, apparently truthfully up to a certain point, that he had been in Syracuse on business on Monday, December 9, and had returned to North Tonawanda on Tuesday afternoon, had spent Wednesday in the insurance company office, and, after an evening with his girl friend, had parked his car in a driveway at his home behind a car owned by Schmidt, his neighbor. Since Schmidt often departed earlier in the morning, Hall long before this had given Schmidt a set of keys to the car so that Schmidt could move it out of the way. Hall said that when he arose around 9:00 A.M. on December 12, the car was parked in front of his house; he left around 10:30 A.M., picked up a Christmas tree, arrived at the office about 11:30 A.M., had lunch with the manager, Mr. Tyler, and departed around 1 P.M. After some seventeen minutes Schaller sought permission to search the apartment and the car, and Hall signed waivers and consents. No money was found.

The interview was resumed shortly after 5 P.M. Schaller advised that Schmidt had been interviewed and had said that he had not moved Hall's car that morning because it was not in the driveway when he arose at 6:30 A.M. Schaller then told Hall "that he did not have to further answer any questions, that anything he might say to me further could be used against him in court, that he was entitled to an attorney, to have an attorney present during any interviews," and that "if he could not afford an attorney, the Government would provide an attorney for him." Schaller also advised Hall that he could waive his rights if he desired, and, in that event, if he decided to stop answering questions at any time, he could do so. After stating that he understood his rights and desired to waive them and continue the interview, Hall executed the standard F.B.I. waiver form.

When he was again asked to trace his activities on December 11 and 12, Hall at first stuck to his story. Later, under the impulsion of the agents' telling him something his girl friend had related to them, he added that, while in Syracuse on December 10, he had sold some stock for $3000 to get his share of a $6000 down payment on a house he planned to occupy with the girl, then pregnant, whom he intended to marry as soon as he could obtain a divorce. On being told that he could not have obtained payment for the stock so quickly, he altered his statement to say that he had sold the stock four weeks earlier and on December 10 had obtained a $3000 check which he placed in a safe deposit box in Syracuse. Finally when Agent Schaller indicated an intention to check this story out with the broker in Syracuse, Hall admitted he had not been telling the truth and said he now wanted to do so. The new version was that he had indeed left his home early in the morning of December 12, in order to keep a rendezvous with a "loan shark" in the parking lot of the Maple Leaf Motel on Niagara Falls Boulevard. One Jimmy, a co-owner of a bar adjacent to the motel, had agreed to negotiate a $3000 loan for him from the unidentified "loan shark," who would telephone Hall where and when to get the money. Around 7:30 A.M. the loan shark arrived and handed Hall an envelope containing $3000, including a $1000 bill and other $100's, $50's, $20's and $10's. On Schaller's request Hall

produced his wallet which contained three $100 bills. Hall admitted that during the morning of December 12 he had made a deposit of $1000 at one bank in North Tonawanda and of $2000 at another.

■ The serious question concerns the initial seventeen minutes of questioning which elicited the false exculpatory statement that Hall's car was in front of his apartment at 9:00 A.M. The parties have devoted a large portion of their briefs and arguments to whether during this period Hall had become the "focus" of the investigation. As put the question is unanswerable. Certainly the agents had "focused" on Hall more than on all residents of Cicero or on other residents of North Tonawanda; on the other hand the focus was not so sharp that they had anything approaching certain, indeed even probable cause to believe he was the robber. Furthermore, the "focus" question, derived from Escobedo v. Illinois, 378 U.S. 478, 490–91,492, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), is not the appropriate test. The phrase was there used in an effort to define the point when the Sixth Amendment forbids the deprivation of a suspect's access to his lawyer. Moreover, the coming of that point was defined not in terms of "focus" alone but of focus plus. It is well to attend to precisely what the Court said: "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution * *." 378 U.S. at 490–91, 84 S.Ct. at 1765. "We hold only that when the process shifts from investigatory to accusatory

—when its focus is on the accused *and* its purpose is to elicit a confession—our adversary system begins to operate, and, *under the circumstances here,* the accused must be permitted to consult with his lawyer." 378 U.S. at 492, 84 S.Ct. at 1766. [Emphasis supplied.] No claim is or could reasonably be made here that the early questioning of Hall violated Sixth Amendment rights.

It is equally plain that "focus" alone does not trigger the need for *Miranda* warnings. As appears from the first *Escobedo* extract we have quoted custody as well as focus and other factors were essential to that decision. Under *Miranda* custody alone suffices. 384 U.S. at 444, 478, 86 S.Ct. 1602. We fail to perceive how one can reason from these two propositions to a conclusion that "focus" alone is enough to bring *Miranda* into play. The only possible basis for such an argument would be that, after limiting *Miranda* to custodial interrogation and defining this as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," 384 U.S. at 444, 86 S.Ct. at 1612, Chief Justice Warren dropped a footnote:

> [4] This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused.

While much dialectic skill has been expended on this footnote, see Graham, What Is "Custodial Interrogation?": California's Anticipatory Application of Miranda v. Arizona, 14 U.C.L.A. L.Rev. 59, 114–15; Kamisar, *supra*, at 339–40, the one thing that is undeniable is that the opinion said that focus means custody, not that custody means focus. As Professor Kamisar has put it, "*Miranda's* use of 'custodial interrogation' actually marks a *fresh start* in describing the point at which the Constitutional protections begin," *id.*—Fifth Amendment protections, that is.

■ This still leaves the courts with the far from easy task of determining

whether questioning was initiated "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. The only two relevant Supreme Court decisions since *Miranda* shed little light. In Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the person interrogated by a federal revenue agent was in custody under any standard; he was in a state prison serving a sentence for a wholly unrelated crime. If the decision has any significance here, which may be doubtful, it would be that the Court favors a rule-of-thumb approach, assumed to be easily applicable, rather than a detailed inquiry into the coerciveness of the "custody" in the particular case since, as pointed out in Mr. Justice White's dissent, Mathis was not coerced into answering the questions "any more than is the citizen interviewed at home by a revenue agent or interviewed in a Revenue Service office to which citizens are requested to come for interviews." 391 U.S. at 7, 88 S.Ct. at 1506. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), put beyond doubt that custodial interrogation may take place outside the station-house, as the *Miranda* opinion had rather clearly indicated although none of the four cases there decided had presented the point. But the officers conceded that "from the moment he [Orozco] gave his name * * * petitioner was not free to go where he pleased but was 'under arrest,'" 394 U.S. at 325, 89 S.Ct. at 1096, and the decision rested upon that, 394 U.S. at 327, 89 S.Ct. 1095.

Schaller was not asked concerning his intentions about holding Hall during the first stage of the interview, and Hall did not say how he regarded his situation. Doubtless this was just as well. The Court could scarcely have intended the issue whether the person being interrogated had "been taken into custody or otherwise deprived of his liberty in any significant way" to be decided by swearing contests in which officers would regularly maintain their lack of intention to assert power over a suspect save when the circumstances would make such a claim absurd, and defendants would assert with equal regularity that they considered themselves to be significantly deprived of their liberty the minute officers began to inquire of them. Moreover, any formulation making the need for *Miranda* warnings depend upon how each individual being questioned perceived his situation would require a prescience neither the police nor anyone else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize *Miranda's* concern with the coercive effect of the "atmosphere" from the point of view of the person being questioned.

The test must thus be an objective one. Clearly the Court meant that *something* more than official interrogation must be shown. It is hard to suppose that suspicion alone was thought to constitute that something; almost all official interrogation of persons who later become criminal defendants stems from that very source. While the Court's language in *Miranda* was imprecise, doubtless deliberately so, it conveys a flavor of some affirmative action by the authorities other than polite interrogation. This view is strengthened by the passage at 384 U.S. 478, 86 S.Ct. 1630, where the Chief Justice, after referring to "the compelling atmosphere inherent in the process of in-custody interrogation" and just before a second and slightly altered affirmation of the test, inserted a footnote reading:

[46] The distinction and its significance has been aptly described in the opinion of a Scottish court:

"In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice [of interrogation at the police station] may be, it must normally create a situation very unfavourable to the suspect."

Chalmers v. H. M. Advocate [1954], Sess.Cas. 66, 78 (J.C.).

Even without the light of *Orozco* we would not have thought this to mean that questioning in the home could never come within the mandate of *Miranda;* we do think it suggests that in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so. This is not to say that the amount of information possessed by the police, and the consequent acuity of their "focus," is irrelevant. The more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda,* and *vice versa.* But this is simply one circumstance, to be weighed with all the others. Although the many relevant decisions of state and lower federal courts since *Miranda,* none of which were cited to us, have not been altogther uniform, this seems the thrust of People v. Arnold, 66 Cal.2d 488, 58 Cal.Rptr. 115, 120–121, 426 P.2d 515, 520–521 (1967); People v. P., 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967); United States v. Gibson, 392 F.2d 373 (4 Cir. 1968); Lowe v. United States, 407 F.2d 1391, 1396–1397 (9 Cir. 1969); and Freije v. United States, 408 F.2d 100, 103 (1 Cir. 1969). See also Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968); United States v. Knight, 395 F.2d 971, 976 (2 Cir. 1968) (Lumbard, C. J., concurring); and Government of Virgin Islands v. Berne, 412 F.2d 1055 (3 Cir. 1969).[2]

█ The *Gibson* case is closer to this one than any other we have found. There the West Virginia police had received information that Gibson was driving a stolen car with Indiana license plates bearing a designated number. They located the car outside a bar where Gibson was seated. An officer invited him outside and asked whether the car was his; after initial denial, he admitted it was and produced a registration which showed alteration. The police then arrested him and gave the warnings. Writing for the court, Judge Sobeloff did "not read *Miranda* as requiring officers to preface with a warning all non-coercive questioning conducted in the course of a routine investigation as in the circumstances of this case. * * In the complete absence of the element of coercion, actual or potential, or police dominance of the individual's will, the mild police activity shown here should not prevent the introduction of statements freely made." 392 F.2d at 376. While the instant case is a bit stronger for the defendant in the restricted size of his quarters, the number of officers present, and the somewhat more extensive questioning, these factors must be weighed against the point that the only piece of information the agents then had was the presence of Hall's car near the scene and at the time of the robbery. Although this was suspicious, it could have been thought susceptible of innocent explanation, especially since Hall's work apparently often took him near Syracuse.

█ It is altogether too easy to fall into the error of allowing the first seventeen minutes of interrogation to be significantly colored by what developed later. The picture presented to us is one of F.B.I. agents conscientiously interviewing a man, engaged in a respectable occupation, who was under considerable suspicion but whom they knew they

2. We disagree with some of the language although not with the result in Windsor v. United States, 389 F.2d 530 (5 Cir. 1968). The language seems to have been substantially qualified by Jennings v. United States, 391 F.2d 512 (5 Cir. 1968); Archer v. United States, 393 F.2d 124 (5 Cir. 1968); and McMillian v. United States, 399 F.2d 478 (5 Cir. (1968). For a case regarded by the Fifth Circuit as falling on the same side of the line as *Windsor,* see Agius v. United States, 413 F.2d 915 (5 Cir. 1969).

could not lawfully arrest, and sedulously abstaining from any threat that they would. We have no reason to believe the agents would not have departed on request or allowed Hall to do so—as indeed they did the next morning when he indicated a desire to see his lawyer—although they might well have kept him under surveillance. It is immaterial that if Hall had attempted to bolt, thereby furnishing added evidence of guilt, the agents would doubtless have restrained him. People v. P., *supra*, 21 N.Y.2d at 10, 286 N.Y.S.2d at 233, 233 N.E.2d 255. Since we agree with the district judge that the initial interrogation was not during a period when Hall was in custody or his liberty was significantly restrained, we have no occasion to consider whether such a finding is subject to full appellate review or is protected by something akin to the "unless clearly erroneous" rule. And since we hold the false exculpatory remark was properly received in evidence, there is no need for us to pass on the Government's alternative argument that any error in its admission was harmless.

 Once this point is passed, little remains. We see no reason to question the district judge's finding that the *Miranda* waivers were freely and voluntarily given with full knowledge by Hall of his right not to do this; evidently Hall was still persuaded that he could talk his way out, or at least thought he had little to lose by trying. The case bears no resemblance to Westover v. United States, 384 U.S. 436, 494, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), on which Hall relies. There is equally little merit in the claim that, even with all of Hall's statements thus properly received, the evidence was still insufficient for submission to the jury. The prosecutor adduced considerable testimony of Hall's guilt in addition to what we have recounted: The head teller of the bank described the robber as carrying a long-barreled gun with a brown stock, and the assistant manager added that it was a lever action rifle of the Winchester type. Late in the evening of December 12,

Hall, after consulting with his attorney by telephone, turned over to the agents a rifle that the assistant manager positively identified as fitting the description of the one he had seen. The head teller remembered that the stolen money included a $1000 bill with a tear, extending down to the face of President Cleveland, and Hall deposited a torn $1000 bill in Buffalo later that morning. The force of this was not destroyed but only somewhat impaired by the head teller's belief that the location of the tear on her $1000 bill was slightly different from that on the one produced at trial. At 9:37 A.M. on December 12, a telephone call from Churchville, N. Y., some ten to fifteen miles west of Rochester, to the New York Telephone Company's business office in Tonawanda where Hall's girl friend worked, was charged to Hall's credit card number. The time and place were wholly consistent with a departure from Cicero shortly after 8 A.M. and arrival in North Tonawanda around 10:-30 A.M. While it is possible, as the defense contends, that someone else made the call and charged it to Hall's account, the jury was entitled to a high degree of scepticism on that score. Against all this, plus Hall's insistence on lunching with his employer on December 12, and the failure of the defense to produce "Jimmy," minor discrepancies in the testimony of the prosecution's witnesses and the break-down of an attempted line-up identification of Hall, by a resident of a town near Cicero, as the occupant of a red Chevrolet, seen in the bowling alley parking lot at 6:30 A.M. on December 12, are not impressive. The Government argued plausibly that Hall would hardly have arrived in the Cicero parking lot so early, and even if the jury did not accept this, it could have found that the witness' failure to identify Hall was an understandable error. In our view the Government's case, built on a combination of Miss Costick's perspicacity and painstaking investigative work by the F. B.I., was not merely sufficient but strong.

Affirmed.