**UNITED STATES of America,**
**Appellee,**

v.

**Glenn W. HALL, Defendant-Appellant.**

**No. 617, Docket 72–1026.**

United States Court of Appeals,
Second Circuit.

Argued April 11, 1972.

Decided April 17, 1972.

Joseph R. Brennan, Asst. U. S. Atty. (James M. Sullivan, Jr., U. S. Atty., N. D. N. Y., Albany, N. Y., of counsel), for appellee.

Mark Kadish, Boston, Mass. (Gerald Alch, Boston, Mass., of counsel), for defendant-appellant.

Before FRIENDLY, Chief Judge, and SMITH and OAKES, Circuit Judges.

PER CURIAM:

In United States v. Hall, 421 F.2d 540 (2 Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), affirming appellant's conviction of bank robbery, we overruled his contention that the receipt in evidence of a false exculpatory statement made to FBI agents during 17 minutes of questioning prior to administration of the warnings required by Miranda v. Arizona, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), with respect to custodial interrogation, violated his Fifth Amendment rights. Familiarity with that opinion is assumed. In July, 1971, Hall moved, under 28 U.S.C. § 2255, to vacate his conviction and sentence on the basis that before the questioning began, the FBI agents had more ground for believing him to have been the robber than had been indicated in the suppression hear-

ing held during trial. Properly recognizing that Hall's motion raised factual issues which could not be resolved by the pleadings, files and records of the case, Judge MacMahon held an evidentiary hearing. Thereafter, in a careful opinion, D.C., 333 F.Supp. 1069, he denied the motion.

We said in our previous opinion that, in determining the difficult question whether questioning was initiated "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," 384 U.S. at 444, 86 S.Ct. at 1612, "one circumstance, to be weighed with all the others" was the degree of the questioners' belief that the suspect had committed the crime. The reason was that, the higher the belief, the greater would be the "tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda* . . .", 421 F.2d at 545. We also said, in discussing United States v. Gibson, 392 F.2d 373 (4 Cir. 1968), that, when the questioning began, "the only piece of information the agent's then had was the presence of Hall's car near the scene and at the time of the robbery"—a fact which, although suspicious, could have been thought susceptible of innocent explanation since Hall's work often took him near Syracuse where the robbery occurred. 421 F.2d at 545.

The evidence at the § 2255 hearing showed that the interrogating agents had some additional information about Hall which had not been developed at the suppression hearing, although we see no reason why it could not have been.

The only two items we deem in any way significant are:[1]

(1) When Agent Schaller went to the Buffalo office of Hall's employer, Employers Insurance Co. of Wausau to ascertain Hall's whereabouts, see 421 F.2d at 541, he learned that Hall had not been there on the morning of the robbery.

(2) Not finding Hall at his home, Agent Schaller went to the office of the telephone company where, as he had apparently learned from a supervisor at the insurance company, Hall's girl-friend, Patricia Anderson, worked. He there learned from Miss Anderson's supervisor that, in contrast to the usual custom whereby Hall accompanied Miss Anderson to work in the morning, each in individual cars, he had not done so that morning, and also that Miss Anderson was leaving soon to marry Hall, who was to come into some money through a sale of stock to effect which he had gone to Syracuse earlier in the week, see 421 F.2d at 542.

Weighing on the other side, Agent Schaller testified that when he first went to Hall's apartment, Mrs. Frawley, a neighbor, told him that she had seen Hall's car outside the apartment between 8:00 and 8:30 A.M., which, if true, would have made it impossible for Hall to be at the scene of the robbery, some 150 miles away, at 8:00 A.M.

Taking the new evidence as a whole, and passing the point of its previous

---

1. Hall relies also on two other items, which we consider irrelevant.

Mrs. Robert Owen who lived at Clay, N. Y., near the scene of the bank robbery, testified that during the morning of the bank robbery, she was interviewed about Hall by two law enforcement officers (an F.B.I. agent and an investigator of the Onondaga County sheriff's office), one of whom (apparently the state investigator) characterized him as a suspect. Around one-thirty or two o'clock, they and two other investigators interrogated Mr. Owen. They learned nothing useful and made no report to the Buffalo FBI office from which the agents who interrogated Hall operated.

Patricia Anderson arrived at Hall's apartment after the agents had given the *Miranda* warnings and were interviewing him. An agent told her it would be better if she did not come in. It is not contended that this made Hall's post-*Miranda* warning statements involuntary, and we fail to see its bearing with respect to the earlier ones.

availability, we join the district judge in not believing that it raised the level of suspicion—itself only "one circumstance, to be weighed with all the others," 421 F.2d at 545, in determining whether Hall was in custody within the meaning of *Miranda*—sufficiently to alter the previous result. Hall's absence from the insurance company office on the morning of the robbery had little meaning. The employer did not consider this unusual; as a sales trainee Hall was not bound to report at the usual opening hour. His failure to accompany Miss Anderson to her job at the telephone company was a bit more suspicious. But the custom was not invariable and its significance to Schaller would have been blunted by Mrs. Frawley's misinformation that she had seen Hall's car in front of his apartment at an hour inconsistent with his being near Syracuse at the crucial time. Finally the fact that Miss Anderson had told her supervisor of an earlier trip by Hall to Syracuse to sell stock—now read by appellant as having alerted the FBI agents to a casing of the bank—added only the sale of stock to the business trip to Syracuse which Hall himself had admitted at the very beginning of his interrogation. See 421 F.2d at 542.

Affirmed.