Glenn W. HALL, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 72–CV–257.

United States District Court,
N. D. New York.

Jan. 10, 1973.

———◆———

Lee S. Michaels, Auburn, N. Y., for petitioner.

James M. Sullivan, Jr., U. S. Atty., Syracuse, N. Y., for respondent; Robert E. Netter, Asst. U. S. Atty., of counsel.

## OPINION

MacMAHON, District Judge.*

Petitioner Glenn W. Hall applies for the third time [1] for post-conviction relief under 28 U.S.C. § 2255. Petitioner was convicted in May 1969 of armed robbery of a bank, following a jury trial before us, sitting by designation in the Northern District of New York. He was sentenced to a prison term of ten years, his conviction was affirmed on appeal, and *certiorari* was denied.[2]

---

\* Of the Southern District of New York, sitting by designation.

1. Petitioner first moved, in May 1969, for post-conviction relief, alleging prejudicial actions on the part of the trial judge, errors in the reception of evidence, errors in the scope of cross-examination and in separating the jury during its deliberations to allow it to go home over the weekend. All of these claims were based on facts appearing in the record and were, therefore, denied for deliberate bypassing of the appellate process and also for lack of merit.

In July 1971, petitioner again applied for post-conviction relief, alleging this time that the prosecutor withheld evidence that would have enabled him to prove a violation of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following an evidentiary hearing, his claims were rejected by us and by the Court of Appeals. *See* United States v. Hall, 333 F.Supp. 1069 (N.D. N.Y.1971), aff'd, 459 F.2d 454 (2d Cir. 1972).

2. United States v. Hall, 421 F.2d 540 (2d Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970).

Relying on Brady v. Maryland, 373 U. S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), petitioner now claims a denial of due process because, allegedly, the prosecution, despite a request for disclosure of information favorable to the defense, withheld a statement of a witness which would have aided him in obtaining an acquittal by proving his alibi. Since the petition and answer raised issues of fact outside the record, we granted an evidentiary hearing.

We find that petitioner was not deprived of a fair trial and, therefore, deny the petition.

The questions presented cannot be understood or answered without reference to the context of facts which resulted in petitioner's conviction.[3] There was no dispute upon the trial that on the morning of December 12, 1968, a masked man, armed with a rifle, approached a teller as she left her car in the parking lot and directed her into the bank. There he forced her to open a vault, herded the manager and another teller inside, and robbed the Cicero branch of The Merchants National Bank & Trust Co. of Syracuse of $37,872.44, none of which was ever recovered. The issue on the trial was whether petitioner was the robber.

Among other evidence, the prosecution relied on two eyewitnesses who saw petitioner's car at the scene of the crime. A young lady and her brother had noticed a man in a maroon car in the parking lot behind the bank about fifteen minutes before the robbery. The lady gave a description of the man's clothing, which generally tallied with the description of the robber's clothing given by the people in the bank. As the man drove from the parking lot, he passed the young lady but he covered his face with his hands so that he could not be seen. Suspicious of the behavior, she observed the license plate number and in a few minutes wrote it down. Later, police found footprints in the snow leading from the place where the maroon car had been parked to a place in the parking lot where the masked man had first encountered the teller. The license plate number was traced and found to have been issued to a car owned by petitioner's employer, The Employers Insurance Co. of Wausau, located in Buffalo, N. Y., and assigned to petitioner, who lived in North Tonawanda, a Buffalo suburb.

About 3:30 P.M. on the day of the crime, special agents of the F.B.I. went to petitioner's apartment house in North Tonawanda. They knocked on his door, but he was not home. The agents went upstairs to an elderly neighbor, Mrs. Frawley, who said that she had not seen petitioner that day but had seen his car in front of the house that morning. She was not sure of the time she had seen the car but believed it was about 8:00 or 8:30 A.M., because she usually went out on her front porch to feed the birds at that time. If this were true, petitioner's car could not have been at the scene of the crime at 8:00 A.M. in Cicero, about 150 miles away from North Tonawanda via the New York State Thruway.

After interviewing other witnesses at the North Tonawanda office of the New York Telephone Company, where petitioner's girl friend worked, and learning that, contrary to his usual habit, petitioner had not accompanied her in his car when she arrived at work in her car that morning, the agents returned to petitioner's apartment house at about 4:20 P.M. and, this time, found him at home.

When initially questioned by special agents, petitioner claimed that he had been home all night and that at about midnight he had parked his car in the single-lane driveway of the apartment house behind the car of his neighbor, Schmidt. Since overnight parking on the street was prohibited, petitioner said that both he and Schmidt had to park in the driveway and had exchanged a set of keys so that neither would block the oth-

---

3. The facts are fully narrated in the first opinion of the Court of Appeals. United States v. Hall, *supra*, 421 F.2d 540.

er as either left for work in the morning. Petitioner claimed that when he got up at about 9:00 A.M. on December 12th, his car was parked in front of the apartment house, where, inferentially, Schmidt had moved it.

Later the same day, the agents interviewed Schmidt, who was positive that petitioner's car was not parked in the driveway, nor in the street, nor anywhere else that he could see when he left for work at 6:00 A.M. Mrs. Schmidt also said that she did not see petitioner's car that morning. Reinterviewed the same afternoon, Mrs. Frawley was not sure which time during the day she had seen petitioner's car because she had been outside a number of times.

Confronted with Schmidt's statement, petitioner changed his story and claimed that he had left his apartment before 6:00 A.M. to meet a loan shark in Buffalo to arrange a loan. Petitioner has never changed that story.

The following day, the agents interviewed Mrs. Frawley for the third time, and now she was not sure which day she had seen the car. Mrs. Frawley was not called at the trial, and since then she died, at the age of seventy-two, on March 16, 1970.

■ Against this factual background, it appears that on April 1, 1969 petitioner moved under Rule 16, Fed.R.Crim.P., for an order directing the government to produce all evidence favorable to him before trial. Judge Port denied the motion without prejudice to renewal upon the trial. The motion was never renewed, nor was there any other request for favorable information. Arguably, this might preclude us from granting relief to petitioner now.[4] We do not consider the procedural point, however, because we find against petitioner on the merits.

■ Petitioner contends that the prosecution's failure to disclose Mrs. Frawley's first statement is sufficient

prosecutorial misconduct to merit a new trial. Admittedly, the prosecution knew of the statement and decided not to disclose it. The only question is whether the prosecution's purposeful nondisclosure warrants a new trial.

Although the applicable guidelines have not yet been definitively declared by the Supreme Court (see Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (opinion of Mr. Justice Brennan)), our Court of Appeals has directed us to seek a workable solution to the problem of whether the prosecution's nondisclosure of evidence favorable to the accused warrants a new trial by considering "not only the maximizing of protection to convicted defendants but the avoidance of impossible burdens on prosecutors and the need to preserve the finality of convictions rendered after trials as nearly faultless as human frailties will permit." United States v. Keogh, 391 F.2d 138, 146 (2d Cir. 1968).

As an aid to analysis of the problem, *Keogh* teaches that prosecutorial misconduct falls into three categories: (a) deliberate suppression of favorable evidence for the purpose of obstructing justice; (b) suppression of favorable evidence material to guilt or punishment irrespective of good or bad faith; (c) inadvertent failure to disclose favorable evidence where no request is made but hindsight reveals that the defense could have put the evidence to "not insignificant use."

We need consider only the first two categories since inadvertent failure to disclose is not involved in this case.

Petitioner claims that the first category is the appropriate criterion here. That category includes those cases where "the prosecutor's suppression is 'deliberate,' by which we include not merely a considered decision to suppress, taken for the very purpose of obstructing, but also a failure to disclose evi-

---

4. *Compare* Shuler v. Wainwright, 341 F. Supp. 1061, 1072 (M.D.Fla.1972), *with*

United States ex rel. Fein v. Deegan, 410 F.2d 13 (2d Cir. 1969).

dence whose high value to the defense could not have escaped the prosecutor's attention." [5] If the nondisclosure is within this class, then a new trial is granted in nearly every case. Cases in this class, in the words of Chief Judge Friendly, "rarely present a problem as to 'the degree of prejudice which must be shown'; almost by definition the evidence is highly material." [6]

Clearly, Mrs. Frawley's statement did not escape the prosecution's attention. Rather, the prosecution admits that it knew of Mrs. Frawley's first statement, but decided not to disclose it because it believed in all good faith that she was mistaken and that her statement was worthless. There is no evidence to suggest that the prosecution's judgment, however unwise, was motivated in the least by a deliberate or presumptively deliberate purpose to obstruct justice.

We find, therefore, that this case does not fall into the first category.

The second category of prosecutorial misconduct includes those cases where the nondisclosure is a "deliberate refusal to honor a request for evidence where the evidence is material to guilt or punishment, irrespective of the prosecutor's good faith or bad faith in refusing the request." Since the refusal here was deliberate but in good faith, the decisive question is whether the evidence withheld is sufficiently material to mandate a new trial. The answer turns on whether there is any reasonable likelihood that the admission of the withheld evidence upon the trial would have affected the judgment of the jury.[7]

Considering Mrs. Frawley's statement first on its face, then with her later statements, and finally in the context of all the evidence, it becomes increasingly clear that there is no reasonable likelihood that its disclosure would have altered the result. The statement, on its face, had little probative value. Standing alone, it is vague on the vital fact of the time of her observation. It was even incorrect and unfavorable, according to petitioner, for it contradicted his most recent alibi that he had driven to downtown Buffalo to meet a loan shark around 6:00 A.M. on the day of the crime. Petitioner could have switched back to his original story that he was at home during the crime in order to make Mrs. Frawley's statement both favorable and useful. The convenient shift in alibis, together with all the other evidence, however, would not only have demonstrated the likelihood that Mrs. Frawley was mistaken, but also, in all probability, would have incriminated petitioner with two guilt-ridden false exculpatory statements.

Considering the first statement with Mrs. Frawley's later statements, it loses nearly all of whatever probative value it

---

5. United States v. Keogh, 391 F.2d 138, 146–147 (2d Cir. 1968).

6. United States v. Keogh, *supra*, 391 F.2d at 147.

7. Giglio v. United States, 405 U.S. 150, 152, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *Giglio* does not refer to the three classes in *Keogh*, but it does cite *Keogh* and states that it is based upon Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which *Keogh* uses to define its second class.

Other formulations of what we believe to be the same standard are: (1) "a significant possibility that the undisclosed evidence might have led to an acquittal or a hung jury", United States v. Miller, 411 F.2d 825, 831 (2d Cir. 1969); (2) "[t]he [undisclosed] evidence must also be shown to be material and of some substantial use to the defendant," United States v. Tomaiolo, 378 F.2d 26, 28 (2d Cir. 1967), cited in United States v. Polisi, 416 F.2d 573 (2d Cir. 1969). Because we believe that these standards are different ways of expressing the standard in *Giglio*, they do not call for a different result here.

Neither party argues, and properly so, that the third class, negligent nondisclosure by the prosecution, is applicable to this case. It is clear that the prosecution deliberately chose not to disclose Mrs. Frawley's statement. Further, *Giglio* may well have abolished the third class, putting all its cases into the second class. Giglio v. United States, *supra*, 405 U.S. at 152, 92 S.Ct. 763. In any event, we need not consider the third class.

may have had. The elderly lady was never certain about the exact time that she saw the car. She was interviewed three different times, and her opinions progressively weakened until she was unsure not only about the time but even the day when she saw the car. She was certain, however, that petitioner's car was dirty in contrast to how clean it usually was. This cuts against petitioner. Another neighbor saw petitioner drive into his driveway at 1:30 P.M. on the day of the crime with a very dirty car and then wash it shortly thereafter. The recently soiled car is consistent with high-speed winter driving on the salted thruway for the 150 miles between Cicero and North Tonawanda, and the hasty washing outdoors on a winter day speaks even more strongly against petitioner.

Taking the first statement in the context of all the evidence, it is clear that there is no reasonable likelihood that it could have affected the jury's judgment. First, as we have shown, there were the two highly creditable neighbors of petitioner, Mr. and Mrs. Schmidt, who were positive that petitioner's car was not parked either in the driveway or in front of his apartment house on the morning of the crime.

Second, the evidence that petitioner's car was in Cicero on the morning of the crime was almost irrefutable. Besides the previously described identification of petitioner's license plate number by a disinterested eyewitness and the similar description of clothes, there was other evidence that petitioner committed the robbery in Cicero. Petitioner had formerly worked in Syracuse and had lived in Cicero. The assistant manager of the robbed bank testified that petitioner's wife had worked there as a teller six months before the robbery, in the summer of 1968, and that petitioner had visited the bank that summer at least twice. Other evidence is described in detail in the first opinion of the Court

of Appeals,[8] where the court found that "the Government's case . . . was not merely sufficient but strong." [9] Briefly, the evidence was as follows:

A telephone call was made at 9:37 A.M. from Churchville, N. Y., 100 miles west of Cicero, to the office of petitioner's girl friend in North Tonawanda and was charged to petitioner's credit card. The record shows that the robber left the Cicero bank at 8:05 A.M. Travelling at 70 miles per hour on the thruway, the most direct route back to North Tonawanda, petitioner would have reached Churchville at 9:30 A.M., placed the telephone call, and easily have driven the remaining 50 miles to North Tonawanda by 10:30 A.M., when the record indicates that petitioner called his office from his home.

The head teller gave the robber a torn $1,000 bill, and petitioner deposited a similar $1,000 bill to his own account in a North Tonawanda bank on the day of the crime.

Finally, petitioner owned a rifle of the same description as the one used in the robbery.

Against this array, petitioner was unable to produce any witness to corroborate his alibi. All he could do was point to minor discrepancies in the prosecution's evidence, show that he was at work in Buffalo by lunch time, and produce a witness who was unable to identify him as the person he had seen in the bank parking lot at 6:30 A.M. on the day of the crime.

In light of the strong case against petitioner, there is no reasonable likelihood that Mrs. Frawley's vague and untenable corroboration of his flimsy and forsaken alibi would have a reasonable likelihood of changing the judgment of the jury.

Accordingly, petitioner's motion to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255, is denied.

So ordered.

8. United States v. Hall, *supra*, 421 F.2d 540.

9. United States v. Hall, *supra*, 421 F.2d at 546.