UNITED STATES of America,

v.

Mohammad RAZZAQ, Defendant.

No. CR–81–00396.

United States District Court,
E. D. New York.

Aug. 24, 1981.

Edward R. Korman, U. S. Atty., Leonard Rosenblatt, Asst. U. S. Atty., Brooklyn, N.Y., for United States.

Marion Seltzer, Legal Aid Society, Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Defendant has moved pursuant to Rules 12(b)(3) and 41(f) of the Federal Rules of Criminal Procedure to suppress physical evidence seized from him at the time of his arrest and statements alleged to have been made by him to law enforcement officers.

At a hearing held on this motion on August 14, 1981, defendant withdrew his motion to suppress evidence seized from him at the time of his arrest, conceding that *United ed States v. Nieves,* 609 F.2d 642 (2d Cir.), *cert. denied sub nom. Figueroa v. United States,* 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980), sustains the legality of the search of his shoes conducted by Customs officers at the time of his entry in the United States at JFK Airport from Pakistan, on June 23, 1981.

There remains to be decided defendant's motion to suppress three statements alleged to have been made by him to Customs patrol officers during the course of a search of his shoes. That motion is brought on the ground that the statements were made without the benefit of the warnings said to be required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Having considered the evidence produced at the hearing, I conclude that defendant's motion to suppress these statements must be denied.

Defendant's contention is that he was entitled to *Miranda* warnings at that point in the search at which a "brown, ovaltine-like substance" burst out of a hole which was being drilled by the Customs patrol officers in the sole of one of his shoes. The statements he seeks to suppress were made in response to questions put to him about the shoes immediately after this occurred.

The sequence of events leading to the statements is as follows: Defendant was first observed by Gilbert S. Parkin, a United States Customs patrol officer, shortly after he had cleared a Customs inspection station and was headed for an exit from the

International Arrivals Building at JFK Airport. Because of peculiarity in the manner in which the defendant was walking, Parkin stopped the defendant, identified himself as a Customs patrol officer, and asked the defendant for his passport and declaration. After examining the declaration, from which Parkin determined that the defendant had no fixed address in the United States, and the passport, from which Parkin determined that the defendant was arriving from Pakistan, Parkin asked several questions of the defendant, the responses to which are not the subject of this motion. Parkin asked the defendant how long he intended to stay and received a response in terms of days. He asked what the defendant's occupation was and was told that defendant was a salesman selling surgical instruments and sporting goods. He also asked defendant who his customers were and was told that a list of customers was in the defendant's luggage. Parkin then asked the defendant to follow his partner, Customs Patrol Officer Goreczny to a nearby search room.[1]

In the secondary search room defendant was asked to remove the articles from his pockets so that he could be patted down, which he did. After Parkin determined that various peculiarities about the shape and fit of the defendant's shoes necessitated further examination, the three moved to a Customs patrol office. In this office Parkin told the defendant to sit in a chair. With his back to the defendant, Parkin then proceeded to drill through the heel and then through the sole of one of the defendant's shoes. As he drilled through the sole, a burst of "brown ovaltine-like" powder appeared. Because Parkin's body was between the defendant and the shoe being drilled, the defendant was not in a position to see that the powder had been discovered.

At this point, the statements complained of were elicited in response to questioning by Parkin.

Parkin, still with his back to the defendant, asked him where he had obtained the shoes. In response to this question, the defendant said he had purchased them in Pakistan. Parkin then asked how much he had paid for them, to which the defendant replied 150 rupees. At this point, in response to no particular question, the defendant is said to have stood up from the chair and to have asked, "What do you have there?" Parkin replied, "I think I may have a narcotics violation." Parkin then field-tested the powder and determined that it was heroin. At this point he formally placed the defendant under arrest and attempted to read him his rights. The defendant at this point complained that he did not understand the word "lawyer," and further efforts at communication were rebuffed. Parkin then called a Drug Enforcement Agent who arrived and assisted in assuring that the *Miranda* warnings were given in both English and Urdu.

## DISCUSSION

■ It is clear that *Miranda* rights attach to aliens at the border providing that circumstances exist which trigger the requirements for warnings. *See United States v. Henry*, 604 F.2d 908 (5th Cir. 1979). Whether or not a significant deprivation of the suspect's freedom requiring the warnings to be given has occurred has been said to depend upon several factors: (1) the probable cause existing for an arrest, (2) the apparent intention of the interrogator, (3) the impression of the defendant, and (4) whether the investigation was focused on the suspect. *United States v. Micieli*, 594 F.2d 102 (5th Cir. 1979). However, no sin-

---

1. Prior to this contact with Parkin, it should be noted that the defendant had already, if ordinary practice was followed, been questioned in English by other Customs officers concerning the length of his stay, the nature of his visit, and whether he had gifts for persons in the United States, or anything to declare. Based on this and other evidence with regard to the subsequent questioning of the defendant, I am persuaded that the defendant was sufficiently acquainted with the English language as to be able to make a voluntary statement within the meaning of 18 U.S.C. § 3501. Based on all the evidence at the hearing, I conclude that the defendant's statements were in fact sufficiently the product of his voluntary choice to permit a jury to consider them with appropriate instructions as required by that section.

gle factor is dispositive since the totality of the circumstances must be considered. *United States v. Kennedy*, 573 F.2d 657 (9th Cir. 1978). The focus is "primarily upon the perceptions of the suspect rather than the intent of the police." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980).

█ In this Circuit, however, the four factors listed above have not been applied mechanically. The overall question to be answered has been formulated by Judge Friendly as follows:

> "... [I]n the absence of actual arrest something must be said or done by the authorities, either in the manner of approach or in the tone or extent of their questioning which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969).

The test is an objective one so that the absence of testimony by the defendant in this case as to the impression created on him is not determinative. *Id.* Nor is it significant that the Customs patrol officer could not be brought on cross-examination to admit that he had formulated an intent to arrest the defendant when he saw the brown powder. *Id.* The issue is not to be resolved, as Judge Friendly noted, by a swearing contest, but by an assessment of the officer's behavior and statements to determine if they were such as would create in a rational person in the defendant's position an impression that he was no longer free to leave. *Id.*

Moreover, both probable cause and the degree of focus on the defendant are of significance only in terms of the larger issue:

> "The more cause for believing the suspect committed the crime, the greater the tendency to bear down in investigation and to create the kind of atmosphere of significant restraint that triggers *Miranda* and *vice versa*." *Id.*

In this case, the fact that the interrogator, Parkin, had probable cause to arrest and had begun to question defendant as a target of investigation is of less significance here than it might otherwise be. This is because (1) there is no evidence that Parkin did, in fact, "bear down" on defendant by asking the two relatively innocuous and non-accusatory questions he asked or otherwise, and (2) the other surrounding circumstances remained consistent with an impression on defendants' part that, following the completion of the examination being conducted by the Customs officials, he would be free to go.

█ This interrogation, unlike that involved in *United States v. Del Soccoro*, 573 F.2d 213 (5th Cir. 1978), was directed at an international traveler in the course of a Customs examination and search. As a result, the restrictions on the defendant's freedom involved in the search and interrogation were, to a large degree, consented to at the time of the decision to cross the border. *United States v. Nieves, supra.* Looked at another way, the international traveler rationally expects that he will be questioned, his luggage inspected and, if suspicions are excited, his clothing and person, at least to some degree, searched, at the conclusion of which he will be free to enter the country. Nothing "said or done" by the patrol officers in this case "either in the manner of approach or in the tone or extent of their questioning" so far departed from these reasonable expectations as to create in a rational traveler in defendant's position the impression that he would not be free to leave as soon as the examination was completed.

While the defendant's inquiry, "[w]hat do you have there," may be some evidence of a concern over the course of the inspection on the part of an innocent international traveler, it seems more likely that this question was stimulated not by anything "said or done" by the agent, but rather, as the Government contends, by an awareness on the part of the defendant that the shoes contained heroin, even before he had been told by the agent's discovery.

In this case, unlike *United States v. De La Cruz*, 420 F.2d 1093 (7th Cir. 1970), and

*United States v. Berard*, 281 F.Supp. 328 (D.Mass.1968), the subject of the interrogation did not know that the interrogator had discovered the contraband, that probable cause existed to arrest him, or that the investigation had so far focused on him that it had reached an accusatory stage. Focusing on the "suspect's perceptions" rather than "the intent of the police," I conclude that the defendant had no reason to believe that he better start talking if he wished to secure his release. Furthermore, in this case, unlike *United States v. Salinas*, 439 F.2d 376 (5th Cir. 1971), the defendant had not left the border area and was still engaged in an extension of the routine border search which it is reasonable to suppose will occur to incoming travelers without leading to their arrest. *And See United States v. Gonzalez-Caro*, 637 F.2d 869 (2d Cir. 1981).

Since I find that defendant was not in custody and that his freedom to move was, in no significant way, restricted, I conclude that the Customs patrol officer did not have to give the defendant warnings before asking him where he obtained the shoes.

SO ORDERED.