**Michael A. BORODINE, Petitioner, Appellant,**

v.

**Edward DOUZANIS, Superintendent, M. C. I. Concord, Respondent, Appellee.**

**No. 78–1405.**

United States Court of Appeals, First Circuit.

Argued Dec. 6, 1978.

Decided Feb. 21, 1979.

---

Howard J. Alperin, Boston, Mass., with whom Barry M. Haight, Boston, Mass., was on brief, for petitioner, appellant.

Robert V. Greco, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief, Crim. Bureau, Boston, Mass., were on brief, for respondent, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Appellant was convicted of first degree murder in the Middlesex Superior Court for the Commonwealth of Massachusetts and sentenced to life imprisonment. After his conviction was upheld on appeal by the Supreme Judicial Court of Massachusetts, *Commonwealth v. Borodine,* 371 Mass. 1, 353 N.E.2d 649 (1976), he unsuccessfully petitioned the United States Supreme Court for a writ of certiorari. He then sought habeas corpus relief in the federal district court, in which he contended first, that his statements to police officers at the scene of the crime were obtained in violation of his *Miranda* rights, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore should have been suppressed at trial; and, second, that the prosecutor's closing argument to the jury so prejudiced him that he was deprived of a fair trial. The district court rejected the petitioner's contentions and dismissed the petition. We affirm the judgment below.

## 1. Appellant's statements to officers at the scene of the crime

In the afternoon of May 17, 1974, police were summoned to the parental home of appellant's girl friend, Joan. Officers Wargin and Peterson found Joan's sister-in-law, Judith, waiting outside the house. Directing them to the cellar, she told them: "She's downstairs in the cellar covered with blood. I think they had a fight." Officer Wargin ran downstairs and discovered the battered woman, with the appellant kneeling beside her, and a bloodied steam iron and bag lying nearby. Appellant asked the officer to help Joan, but examination showed that she was lifeless.

Officer Wargin then asked the appellant to accompany him to an adjoining laundry room in order to remove him from the immediate vicinity of the body. The room was small, not well lit, and, like the temperature outside, quite warm. Appellant, naked from the waist up and with blood on his upper torso and hands, was asked to sit down. Officer Wargin then proceeded to ask him who he was, what his relationship was to Joan and what had happened to her. Finding the appellant upset, the officer halted the questioning and suggested that he wash his hands and face and calm down. Appellant did so and then answered the questions, explaining that he and Joan, who were planning to be married, had had an argument about adopting children, that they had cursed each other and Joan had left. He then told the officer that after finishing a cup of tea, he set out to look for her, eventually discovering her in a crouched position at the foot of the cellar steps and moving her to the reclining position in which she now lay.

This period of questioning lasted approximately ten minutes. It was interrupted by the arrival of Lieutenant Duffy and several other officers. Duffy examined the body and the iron, discovered that a sink upstairs had blood in it and found a broken thermos bottle lying in the hallway leading to the cellar steps. He then entered the laundry room, and promptly gave appellant *Miranda* warnings, to which appellant replied that he would tell Duffy anything he wanted to know. With the occasional participation of another officer, Duffy then questioned appellant for approximately an hour. The appellant essentially recounted what he had told Officer Wargin, but altered his description of events by stating that after he and Joan had had the fight, he had taken a walk in Newtonville for ten or fifteen minutes. In addition, he asked the officer whether he thought he was responsible for Joan's death and made several comments that he was "in a lot of trouble". At the conclusion of this interrogation, he was given a card which once again advised him of his rights. He signed the card, was arrested and taken to the station house. Appellant finds fault with these police procedures in two respects.

### Officer Wargin's ten minute questioning

Appellant's first contention is that Officer Wargin's failure to inform him of his *Miranda* rights before questioning him for ten minutes in the laundry room rendered any statements made to that officer inadmissible at trial. In particular, he claims prejudice from the fact that the prosecutor drew the jury's attention to the discrepancies between his responses to Wargin and Duffy.[1] We therefore must deter-

---

1. Each version was improbable. The first asked the jury to believe a murder of considerable violence was occurring in the quiet house near appellant, who remained oblivious. The second required the assumption that during appellant's ten or fifteen minute absence from the house an interloper, with perfect prescience, entered, did the deed, and left. It may be argued that the presence of two unlikely versions as opposed to one added little of prejudice. But we shall assume some significant increment in prejudice.

As the district court properly noted, a defendant need not have admitted his guilt to an officer in order to claim that *Miranda* warnings should have been administered to him. As the *Miranda* Court stated:

"[N]o distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used

mine whether Wargin's questioning constituted custodial interrogation, that is, "questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way", *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612, in which case *Miranda* warnings should have preceded the inquiry, or constituted "general on-the-scene questioning as to facts surrounding a crime", making recital of the warnings unnecessary. *Id.* at 477–78, 86 S.Ct. at 1629. Drawing the line between custodial interrogation and general on-the-scene questioning has often proved a difficult task, *see, e. g., United States v. Hall,* 421 F.2d 540, 543–44 (2d Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), *aff'd on rehearing en banc,* 459 F.2d 454, 455 (2d Cir. 1972). Recently, however, the Supreme Court, in *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam), has provided some guidance in this area:

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only when there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and

to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." *Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966).

to which it is limited." (Emphasis in original.)

And, as this circuit has recognized, the applicability of *Miranda* must be determined by an objective rather than a subjective test, "requir[ing] at least some objective manifestation that the defendant was 'deprived of his freedom of action in [a] significant way'," *Fisher v. Scafati,* 439 F.2d 307, 310 (1st Cir. 1971); *see Freije v. United States,* 408 F.2d 100, 103 (1st Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 137, 24 L.Ed.2d 111 (1969).

Appellant points to a number of circumstances which, he contends, show that Officer Wargin compelled him to remain in the laundry room and to respond to his inquiries, depriving him of the freedom to depart and thus placing him "in custody". He notes the violent death, his presence on the scene, the officer's knowledge that "they" had had a fight, the movement of appellant, blood-stained and quite nervous, into a small adjoining room for questioning and concludes that no reasonable person could consider himself free to leave when "subjected to [this] significant restraint in a coercive environment." Finally, appellant maintains that Officer Wargin's inquiries cannot be considered "general on-the-scene questioning" because they lasted for a ten minute period.

■■■ Our scrutiny of the facts as depicted by the parties and as revealed in the transcript of the comprehensive pretrial suppression hearing, as well as case law involving like situations, convinces us that the district court properly concluded that: "[Officer Wargin's] questions to petitioner were general, routine and necessary to preliminary investigation", and that appellant was not "in custody" when the questions were asked.[2] Responding to a call over his

2. Appellant's suggestions that the district court applied an incorrect legal standard in determining whether or not he was "in custody" are unfounded. The court properly stated that neither subjective intent of the officer and defendant nor whether the authorities have focused on the defendant are the relevant considerations and turned to an analysis of whether the defendant had been deprived of his freedom in a significant way.

radio that a person was bleeding, Officer Wargin arrived at the scene, and, equipped with no other information than Judith's exclamation that "they" had had a fight, found appellant kneeling beside a woman's body, supporting her head in his hands, and repeatedly asking the officer to help her. Appellant's attempts to paint himself as the prime suspect in the slaying from the moment the officer saw him and thus unable to leave had he attempted to do so are unpersuasive. The officer had no basis on which to conclude that appellant, completely unknown to him, was the person, unidentified by Judith, who had had a fight with the woman. And although the officer quickly determined that Joan had met a violent death, he had no reason at that time to believe that appellant was responsible. Indeed, appellant's apparent distress and calls for help may have indicated the contrary to the officer. The presence of blood stains on his hands and torso were not necessarily suspicious, as the officer had found him holding the woman and was later told by appellant that he had moved the body. The questions which ensued were those of an officer called to the scene of a crime about which he knew nothing and attempting to find out what had happened. No one, including the appellant, stood accused of the slaying.[3] Moreover, the locus was not a police station, nor even a neutral location, but a house to which he came as a familiar.

*United States v. Barnes,* 150 U.S.App. D.C. 319, 464 F.2d 828 (1972), involved a situation similar to this one. As here, an officer was summoned to a residence when a radio call indicated trouble. Upon his arrival, he was met outside by a woman who told him that the defendant had set fire to the victim. The officer then asked the defendant whether that was true, the response was affirmative, and the defendant was arrested. The court held that *Miranda* warnings were not required before the questions took place, explaining:

"It must be borne in mind that Officer Layfield knew nothing of what had happened in the Blizzard apartment. He was seeking to find out. It was Mrs. Blizzard, not Sergeant Layfield, who precipitated the investigatory question. At this point no one had been accused of any crime." *Id.* 150 U.S.App.D.C. at 320, 464 F.2d at 829.

The fact that Officer Wargin asked the appellant to move into the laundry room and questioned him there do not suffice, as appellant contends, to transform this questioning into a custodial interrogation. When asked at the suppression hearing why he had moved the appellant into the laundry room, he responded: "My main purpose was to take him away from the body because I didn't know whether he was a brother or a relative. And no sense in looking at the body. So I took him in the laundry room to try to calm him down." The officer's treatment of appellant in the laundry room was consistent with this expressed motive. He attempted to calm him, knelt beside him and suggested that he wash his face and hands. At no time was the door closed or the appellant physically restrained or psychologically pressured. *See Iverson v. State of North Dakota,* 480 F.2d 414, 425 (8th Cir. 1973). There was nothing "said or done by the [officer], either in [his] manner of approach or in the tone or extent of [his] questioning, which indicates that [he] would not have heeded a request to depart or to allow the suspect to

---

3. We are mindful of Judge Friendly's warning that "[i]t is altogether too easy to fall into the error of allowing the first [brief period of questioning] to be significantly colored by what developed later". *United States v. Hall,* 421 F.2d 540, 545 (2d Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970), *aff'd on rehearing en banc,* 459 F.2d 454 (2d Cir. 1972). The fact that it became increasing-

ly likely that appellant had played a role in the slaying, resulting in a later interrogation—preceded by *Miranda* warnings—during which he undoubtedly would not have been permitted to leave and in his subsequent arrest does not convince us that appellant had been deprived of his freedom in a significant way during the initial period of questioning.

do so." *United States v. Hall, supra,* 421 F.2d at 545.

■ We also cannot agree with appellant's suggestions that the ten minute questioning was too long to constitute general on-the-scene questioning and that that category is restricted to a rapid interchange of several moments' duration. This quantitative approach ignores the fundamental inquiry mandated by *Miranda*—whether the person is placed in a coercive environment which restricts his freedom so as "to render him 'in custody'", *Oregon v. Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. 711, a scenario which can develop in a matter of moments, *see Orozco v. Texas,* 394 U.S. 324, 325, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), or not materialize over a three hour period of questioning, *see Beckwith v. United States,* 425 U.S. 341, 342–43, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

Furthermore, other courts have characterized interrogations of longer than ten minutes as general investigative questioning, which, like on-the-scene questioning, need not be preceded by *Miranda* warnings, *see Miranda v. Arizona, supra,* 384 U.S. at 477–78, 86 S.Ct. 1602. The facts in *United States v. Hall, supra,* 421 F.2d 540, bear similarity to the case at hand. Officers arrived at defendant's apartment to investigate a robbery, telling him of their suspicions that he was the perpetrator and seeking to question him. He agreed and was questioned for seventeen minutes, during which time false exculpatory statements were elicited. Later in the day, his *Miranda* rights were read to him for the first time. He waived them and related a story which in some respects conflicted with his earlier statements. Recognizing that the existence of even considerable suspicion

surrounding the defendant was not controlling, the court found no objective indication that the officers had put him in custody or otherwise deprived him of his freedom. Similarly, in *Iverson v. State of North Dakota, supra,* 480 F.2d 414, defendant was subpoenaed to the police station to answer questions about the murder of two young women who lived in his apartment building. He was questioned about his whereabouts at the relevant time, his relationship to the victims, and his awareness of others who might have known them, and permitted to leave. The court, concluding that he was not in custody, emphasized that the investigation had barely begun, that it was still wide ranging, that he had neither been restrained nor arrested and that "[h]is total interrogation lasted *only twenty minutes."* *Id.* at 423 (emphasis added). *See United States v. Tobin,* 429 F.2d 1261, 1264 (8th Cir. 1970) ("the defendant was subjected to only about 20 minutes of questioning immediately following the time he arrived at the station").[4]

We conclude that the ten minute interrogation conducted by Officer Wargin constituted general on-the-scene questioning rather than a custodial interrogation. Accordingly, *Miranda* warnings need not have preceded the inquiry, and the statements elicited were properly admitted at trial.

### *Appellant's subsequent waiver of his Miranda rights*

■ Appellant's second contention is that his response, after he was informed of his *Miranda* rights by Lieutenant Duffy, that: "I will tell you anything you want to know", cannot be considered a voluntary waiver, rendering his subsequent state-

---

4. Appellant's reliance on two opinions by the District of Columbia Circuit is misplaced. He contends that although that court originally concluded that a confrontation between the defendant and an officer on the street was general on-the-scene questioning, *see Allen v. United States,* 129 U.S.App.D.C. 61, 64, 390 F.2d 476, 479 (1968), it altered its holding and found custodial interrogation when further development of the facts showed that the questioning had lasted for ten minutes, *see Allen v. United States,* 131 U.S.App.D.C. 358, 404 F.2d 1335 (1968) (motion to modify opinion denied). The appellant fails to note that the fact situation was found to be altered in a number of significant respects, one of which was that "appellant confessed 'approximately ten minutes' *after he had been arrested."* *Id.* 131 U.S.App.D.C. at 359, 404 F.2d at 1336 (emphasis added). The case therefore does not stand for the proposition that ten minutes is too long a period to constitute general on-the-scene questioning.

ments inadmissible.[5] He maintains that "the circumstances surrounding Duffy's interrogation were so emotionally charged that one must conclude that it was psychological coercion—and not free will—that led [him] to forego the exercise of his constitutional rights."

The government bears a heavy burden when it attempts to show that a person in custody both understands and voluntarily waives the exercise of his constitutional rights, *see Miranda v. Arizona, supra*, 384 U.S. at 475, 86 S.Ct. 1602; *United States v. Christian*, 571 F.2d 64, 68 (1st Cir. 1978); *United States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977), but we believe that it has met its burden here. Appellant's characterization of the laundry room interrogation as a coercive environment in which his will was not his own is unpersuasive on the facts as he presents them and is amply contradicted by testimony elicited at the suppression hearing. This was hardly a case in which "the behavior of law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely determined". *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976), *quoting Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

Although several officers moved in and out of the laundry room while the interrogation took place, appellant was questioned by Lieutenant Duffy alone with a brief follow-up by Officer Cox alone. The officers treated him with courtesy and restraint, applying no pressure whatsoever. The appellant, 23 years old, the recipient of a high school equivalency certificate for studies pursued while serving in the Coast Guard, and a subsequent student of computer programming, expressed an understanding of his rights and stated his willingness to tell them whatever they wanted to know. And while Officer Wargin considered the appellant upset and very nerv-

ous when he questioned him for the previous ten minutes, the other officers, who questioned him after he waived his rights, described him as calm, able to understand the questions and coherent in his responses. The appellant was asked to explain what had happened in narrative form and was not badgered with a long or repetitive series of questions. His explanation was relayed in a conversational tone of voice. Consequently, we are convinced that the appellant understood his rights and voluntarily waived them.

*2. The prosecutor's closing argument to the jury*

■■■ Appellant also argues that the prosecutor's closing argument, in which comments allegedly were made about his failure to take the stand and testify on his own behalf in violation of the Fifth Amendment, deprived him of a fair trial. *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The prosecutor indeed was strolling in a minefield, and were we reviewing his conduct as an exercise of our supervisory powers on appeal from a federal district court, we might more readily be inclined to reverse the conviction. *See, e. g., United States v. Flannery*, 451 F.2d 880 (1st Cir. 1971). However, the scope of our review of a state court proceeding is "the narrow one of due process", and "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). In the wake of *Donnelly v. DeChristoforo*, this court has said that it will determine whether a state prosecutor has infringed an accused's Fifth Amendment right to remain silent by looking to:

---

5. Because we have rejected appellant's claim that Officer Wargin's questioning was custodial interrogation, we need not reach an additional argument that: "since the initial questioning by Wargin constituted 'custodial interrogation' and was not preceded by *Miranda* warnings, Duffy's interrogation qualifies as 'fruit of the poisonous tree' requiring exclusion of the Petitioner's statements to Duffy."

"[w]hether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Lussier v. Gunter,* 552 F.2d 385, 389 (1st Cir.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977), *quoting Knowles v. United States,* 224 F.2d 168, 170 (10th Cir. 1955).

Applying that standard to the case at hand, we do not find that the impropriety of the prosecutor's remarks rose to the level of a constitutional deprivation.

We will address each of the prosecutor's remarks to which defendant objects. First, the prosecutor noted that the victim "did not have an enemy in the world. If she did, you would have heard about it, that is for sure." The comment, we believe, did not "naturally and necessarily" draw the jury's attention to the defendant's silence. This is not a case in which the defendant was the only party who could have testified about the evidence in question. *Compare Lussier v. Gunter, supra,* 552 F.2d at 389 *and United States v. Kubitsky,* 469 F.2d 1253, 1255 (1st Cir. 1972) *with Desmond v. United States,* 345 F.2d 225, 227 (1st Cir. 1965). Evidence of "enemies" of the victim could have been developed by witnesses other than the defendant or brought out by defense counsel when cross-examining the victim's relatives. Moreover, defense counsel promptly objected to the remark, and the court immediately responded: "No. The defense does not have to produce any witnesses. The jury will disregard that remark."

Second, the defendant points to portions of this recital by the prosecutor:

"Now, you have to unfortunately, ladies and gentlemen of the jury, part of your job is you have to try to put yourself at the scene and try to think of what it was like. You just see him sitting there. Is that consistent with his story. I mean it is absolutely, it is absurd. He knows, he knows ladies and gentlemen of the jury, that he is guilty. He knows it. He is sitting there—

[objection made and overruled]

"At this time, ladies and gentlemen of the jury, he knows as he sits there, you know from the evidence that you have heard, ladies and gentlemen of the jury, that he knew, he knew what had happened to that girl."

This display of rhetoric, which added little to the force of the prosecutor's argument and was subject to possible misinterpretation by the jury, demonstrates remarkably poor judgment on the part of the prosecutor. We cannot find, however, that these remarks were intended to or would "naturally and necessarily" be understood by the jury as a comment on the defendant's failure to take the stand at trial. They appear in the context of the prosecutor's attempts to recreate the scene of the crime, as the defendant sat in the laundry room and was questioned by Lieutenant Duffy and Officer Cox. The court so understood the comments, as it later told defense counsel, who had moved for a mistrial, at the bench, and counsel concurred in that interpretation. And while defendant had the right to remain silent during that custodial interrogation as well as at trial, he made a knowing waiver of that right and proceeded to tell his story to the officers. *See United States v. Mann,* 590 F.2d 361 at 371 (1st Cir. 1978).

Third, the prosecutor concluded his argument as follows:

"I shall respectfully submit to you, ladies and gentlemen of the jury, that this man, Michael Borodine, who you saw through the course of the trial just sit there. He's as calm as he can be, he never had a shred of remorse from the beginning right up until now."

These comments, when considered as a whole, were probably intended and understood as a reflection on the defendant's expressionless courtroom demeanor rather than on his right not to take the stand. Thus, although they were improper in the sense of being irrelevant (a defendant's "courtroom behavior off the stand is [not] in any sense legally relevant to the question of his guilt or innocence of the crime

charged", *United States v. Wright,* 160 U.S. App.D.C. 57, 62, 489 F.2d 1181, 1186 (1973)),[6] they "raise no habeas corpus issue" that can be grounds for reversal of a state court conviction. *Bishop v. Wainwright,* 511 F.2d 664, 668 & n. 5 (5th Cir. 1975), *cert. denied,* 425 U.S. 980, 96 S.Ct. 2186, 48 L.Ed.2d 806 (1976).[7]

Moreover, even if the jury had taken the portion of the comment that they had seen the defendant "through the course of the trial just sit there" as an allusion to his decision not to take the stand, the court gave a strong curative instruction in its charge to the jury,[8] which we believe adequately obviated the prejudice which may have been occasioned by the prosecutor's improper remarks:

"Further, no unfavorable inference can be drawn against the defendant from the fact that he did not take the stand. The defendant has an absolute right, under our constitution, not to testify. If he does not do so no one may even speculate or even inquire as to the reasons that may have led to that result.

"Further, the defendant has no obligation to express to anyone his feelings about this incident. Any statements and final argument by the district attorney with regard to any allegation of his lack of remorse may be disregarded and should be disregarded and must be disregarded as immaterial and inappropriate."

■ In addition, the defendant objects to a comment which he alleges deprived him of his general due process right to a fair trial, rather than specifically infringing his Fifth Amendment right to remain silent.[9] Early in his argument, the prosecutor stated that:

---

6. In *United States v. Wright,* 160 U.S.App.D.C. 57, 489 F.2d 1181 (1973), the court, in an exercise of its supervisory powers over federal trials, found the prosecutor's comment, with the court's approval, on the defendant's unruly courtroom behavior to be one of numerous grounds for reversal. The court particularly noted that the jury should have been instructed to disregard the defendant's behavior. *Id.,* 160 U.S.App.D.C. at 62, 489 F.2d at 1186. That case is of course readily distinguishable from the one at bar. The instant case is before us in a habeas corpus proceeding rather than on direct review from a federal district court and a curative instruction, absent in *Wright,* was given by the Massachusetts court.

7. The prosecutor's comment in *Bishop* was similar to the remarks made in this case:
    "Look at his attitude during the week. Have you seen one little ounce of remorse on his face, one outburst, one apparent showing of concern? He's sat there like a knot on a log through the whole trial. He didn't talk to his lawyer, hasn't said anything. He just sits there. He doesn't do anything. Absolute nothing." *Bishop v. Wainwright,* 511 F.2d 664, 668 n. 5 (5th Cir. 1975), *cert. denied,* 425 U.S. 980, 96 S.Ct. 2186, 48 L.Ed.2d 806 (1976).

8. Defendant did not object to this remark when it was made, at the end of the prosecutor's argument, and a *sua sponte* instruction was not given by the court. However, the defense counsel immediately moved for a mistrial at the close of the argument, citing the comment that defendant had shown no remorse as one of his grounds, and the court, while denying the motion, in its charge to the jury dealt with the improper remarks in a manner which we consider sufficiently immediate and forceful. *See Lussier v. Gunter,* 552 F.2d 385, 389 & n. 2 (1st Cir. 1977).

9. The government argues that in *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974), the Court held that the defendant must show that the prosecutor's comment infringed on a specific right guaranteed by the Bill of Rights, such as the privilege against self-incrimination. We disagree. Although the Court distinguished between such a case and a claim "only that a prosecutor's remark about respondent's expectations at trial [that he would be convicted of a lesser offense than first-degree murder] by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process", it did not state that the latter more general claim could never be made but that it did "not believe that examination of the entire proceedings in this case supports [the defendant's] contention." *Id.* The Court did suggest, however, that a defendant faces a more difficult task in making the general due process claim. *Id.*
    Furthermore, it is not so clear in the case at bar that the prosecutor's reference to what certain witnesses would tell the jury in the lobby, if they could, did not infringe on a "specific right guaranteed by the Bill of Rights", *id.,* namely, the right of confrontation and cross-examination. *See Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). As the Court in *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965), stated:
    "In the constitutional sense, trial by jury in a criminal case necessarily implies at the

"Several witnesses, if they were permitted, Lieutenant Duffy and Doctor Bigelow and so on and so forth, or if they were talking to you in the lobby, would tell you that as a matter of fact he smashed her over the head with the point of the iron, but they can't say that to you—"

Defense counsel immediately objected, and the court chastised the prosecutor: "The jury is not going to speculate as to what a witness might have said. The jury is only concerned with what the witness said." The prosecutor apologized and continued his argument.

The Supreme Judicial Court considered the remark, albeit improper, to be merely "an artless choice of words employed by the prosecutor in an attempt to explain that the jury had to draw the ultimate conclusion from the specific facts", 353 N.E.2d at 655, and the district court employed like reasoning. We do not believe that this characterization, even if accurate, minimizes the prejudice of the remark. The prosecutor knew quite well that Lieutenant Duffy and Doctor Bigelow, who were not eyewitnesses to the murder, could not testify that it was their opinion that defendant had struck the fatal blow, and his apparent attempt to circumvent that inconvenience by in effect so testifying for them is indefensible. However, we find that the court's swift instruction to the jury, forceful enough to prompt an apology by the prosecutor, was an adequate antidote to the prejudice occasioned by the remark. Consequently, we cannot say that the comment "by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo, supra,* 416 U.S. at 643, 94 S.Ct. at 1871.

We hold, therefore, that the prosecutor's closing argument, considered as a whole, did not deprive the defendant of his right to a fair trial. We emphasize, however, as did the Supreme Judicial Court, that our conclusion that reversal is not war-

ranted as a matter of constitutional law does not by any means lessen our disapproval of the prosecutor's use of the type of rhetoric we have considered here.

*The judgment of the district court is affirmed.*

very least that the 'evidence developed' against a defendant shall come *from the witness stand* in a public courtroom where there

is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (Emphasis added.)