UNITED STATES, Appellee,

v.

Specialist Robert H. KIRKS, 235–13–4684, United States Army, Appellant.

ACMR 8903827.

U.S. Army Court of Military Review.

29 Jan. 1992.

For Appellant: Colonel Robert B. Kirby, JAGC, Major Peter V. Train, JAGC, Captain Timothy M. Lawlor, JAGC, Captain Michael J. Berrigan, JAGC (on brief).

For Appellee: Colonel Alfred F. Arquilla, JAGC, Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Thomas E. Booth, JAGC, Captain Timothy W. Lucas, JAGC (on brief).

Before FOREMAN, CREAN and HAGAN, Appellate Military Judges.

## OPINION OF THE COURT

FOREMAN, Senior Judge:

Before a general court-martial composed of officer and enlisted members, the appellant was charged with two specifications of indecent acts with his two-year-old stepson and one specification of indecent acts with the seven-year-old daughter of a German family who had befriended him, all three occasions alleged to have been "with the intent to arouse, appeal to, and gratify the lust and sexual desires" of the appellant, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1982). He also was charged with committing sodomy with the seven-year-old girl and obstructing justice, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925, 934. Contrary to his pleas, the court-martial convicted the appellant of the two specifications of indecent acts with his two-year-old stepson, except the allegation that he intended to "arouse, appeal to and gratify" his lust and sexual desires. The court-martial found the appellant not guilty of sodomy with the seven-year-old girl, but guilty of the lesser offense of committing an indecent act "with an intent to gratify his sexual desires," and

guilty of obstructing justice, both in violation of Article 134, Uniform Code of Military Justice. The approved sentence provides for a dishonorable discharge, confinement for four years, forfeiture of all pay and allowances, and reduction to Private E1.

## I. THE EVIDENCE

The appellant's wife testified that in October 1987, she observed her two-year-old son, Adam, "fingering" his anus. She asked him, "Adam, where did you learn that at?" and Adam responded that "daddy" had touched his anus. Several days later, during dinner, Adam again touched his anus, was asked about it by his mother, and responded by saying to the appellant, "Robby, you did this to me." The appellant's nickname is "Robby." Mrs. Kirks told the appellant that she intended to take Adam to the hospital for an examination, and the appellant discouraged her, arguing that a social worker would be "over our shoulders all the time" and "they're going to be pointing a finger at you, too." Mrs. Kirks testified that she did not report the incident because she had no proof, except the word of her two-year-old son against her husband, who was a military policeman. Adam's allegations were eventually reported by Private C, another military policeman who had become romantically involved with Mrs. Kirks, after he and the appellant had an altercation at the Kirks' quarters.

Adam, who was four years old at the time of trial and two years old at the time of the alleged indecent acts, testified that the appellant touched his "weanie" and inserted his finger into his anus. Adam demonstrated what the appellant did using an anatomically-correct doll. Adam responded to further questioning as follows:

Q. How did—did that feel good?
A. [Shook head negatively.]
Q. No? Did it hurt?
A. [Shook head negatively.]
Q. It didn't hurt?
A. [Nodded head affirmatively.]
Q. It did hurt.
A. It was going into my butt.

Q. It hurt going in your butt?
A. Yeah.

Adam testified that the abuse occurred while he was wearing underwear, the appellant was fully clothed, and they were sitting in the living room while Mrs. Kirks was in the adjoining dining room.

Adam refused to look at the appellant during the trial. He identified the appellant as "Robby" several times from a family photograph, but when asked to identify him in the courtroom, responded as follows:

Q. Is Robby [the appellant] here today?
A. Uh-huh.
Q. Uh-huh? Where is he?
A. He's in the room.
Q. He was in the room? Is he here now? Or you just don't want to look?
A. I don't want to look for him.

On cross-examination, the trial defense counsel pursued Adam's refusal to identify the appellant further:

Q. Okay. Do you see him anywhere in this room now?
A. No, my mommy told me I couldn't see him anymore and couldn't talk to him anymore.

Notwithstanding his tender age, Adam did not hesitate to correct the trial counsel and military judge when they misstated his testimony. Adam's following colloquy with the trial counsel and military judge is illustrative:

TC. Why is Robby bad?
Adam. Because he [unintelligible]
MJ: I didn't hear that. Can you tell me that, again, real loudly?
Adam. He learned it when he was bad—when he was Robby.
MJ: He did what?
Adam. He learned it when he was Robby.
TC: He ruined it when he was Robby.
Adam. He learned it.
MJ: What did he ruin?
Adam. Learned.

On Christmas eve, 1987, the appellant became acquainted with a German family, Mr. and Mrs. L, and their daughter, Kerstin, age seven. He quickly became a close

family friend. He visited their home once or twice a week and stayed overnight nearly every weekend. When the appellant visited, they drank, ate, watched television, played cards, "everything what you do with family." The appellant and Kerstin were, in the words of Kerstin's mother, "like brother and sister."

Kerstin testified that on "many" occasions the appellant came into her bed room to kiss her good night and while in her bedroom pulled down her pajama pants and underpants, inserted his finger into her vagina, and licked her vagina. On one occasion, he asked Kerstin to touch his penis, but she refused. Kerstin testified further that on one occasion after the appellant's actions, she removed her clothes at a playground and told "Johannes" that the appellant "played" with his tongue and finger.

In April 1989, a school official informed Mrs. L that Kerstin had disrobed at school and when confronted by her teachers, had mentioned "Robby." Upon questioning by Mrs. L Kerstin said that "Robby" had sexually abused her. Mr. and Mrs. L first contacted the Army Public Affairs Office and then the German police.

On 17 April 1989, the appellant was interviewed by special agents of the Army Criminal Investigation Command (CID) and informed that he was suspected of sexually abusing Kerstin. Shortly thereafter, at about 1600 on the same day, the appellant telephoned Mrs. L and asked, "Hey, what's going on?" Mrs. L refused to talk to the appellant and told him to call later and speak to her husband. The appellant called again at about 2000 and spoke to Mr. L, with Mrs. L listening to the conversation over their speaker phone. The appellant asked Mr. L, "Hey, what's going on?" Mr. L told the appellant that Kerstin had told them about the appellant's sexual abuse. The appellant denied it, and Mr. L told the appellant that he believed Kerstin and that he wanted to know how many times the appellant had abused Kerstin. The appellant was weeping. He asked Mr. L, "Please take back the charge," because it would ruin his career. The appellant promised to "do anything to make it up," and

acknowledged that he was "sick." Mr. L suggested that the appellant seek psychological or psychiatric treatment and offered, "Maybe I can help you if I make a call and can maybe drop the charge, but only if you promise to seek this psychiatric treatment." Mr. L kept saying, "I know that you've done it but I want to know how often." Finally, the appellant said, "If it would help you and you take back the charge," and Mr. L responded, "Okay, I will take back the charge." The appellant then admitted that he had abused Kerstin three times. Mr. L was hurt and angry during the conversation, and upset that the appellant was only concerned about his own future and never said he was sorry. Mr. L testified that he wanted to help the appellant:

I said it to the German police when I have been there afterwards that I don't like to have him in prison or something like this. He must be helped and it couldn't change everything to my daughter if he is in prison or something but it—so the German police told me to take a charge on him because then there is no chance that it could happen twice. That's all why we are sitting here.

The appellant did not testify on the merits. The military judge required bifurcated arguments, dealing first with the allegations involving Adam and then with those involving Kerstin. During closing argument on the allegations involving Adam, the trial counsel called attention to the appellant's impassive demeanor during the trial. He argued:

And did you notice the accused during this trial? There's one word that I would use to describe his demeanor and his look—two words: "The iceman." Cold as ice during this entire trial.

After marshalling the evidence supporting Adam's and Mrs. Kirks' credibility, the trial counsel again commented on the appellant's demeanor, arguing as follows:

The bottom line is, is Adam's story is not only believable but is credible. Adam and Mrs. Kirks have waited two years for a fighting chance to tell their tragic story. Show them that the wait and

emotional cost that they have borne and paid to this—for this today have not been all for naught. Convict him for the two offenses which he is charged with Adam. He's done it. Your gut tells you he's done it. The evidence shows you he's done it. His demeanor should help you determine that he has done it. Convict him for the crimes against Adam.

Out of the presence of the court members, the trial defense counsel objected to the trial counsel's argument on the ground that it was an improper comment on the failure of the appellant to testify. The military judge agreed and offered to instruct the court members not to draw any adverse inference from the failure of the appellant to testify. The military judge and the trial defense counsel had the following discussion:

> MJ: Well, I'll—if you want, I'll give an instruction to the court members that—about the accused's right to remain silent and they can't consider it at this point. As far as the "Iceman" comment, I would have preferred that the Government not have used that terminology; however, it's hard for me, having sat here for the—well, I won't even refer to the 39(a)s—but to the two days of testimony and not have to state for the record that I think that the trial counsel's comment probably is a fair and accurate representation of the accused's demeanor during the course of the trial. I probably wouldn't have picked quite those words but it's one thing that has struck me throughout this trial.
> DC: Your Honor, the law requires nothing more of him.
> MJ: Well, I understand that but common experience will tell you that perhaps he should have showed some emotion through the testimony of some of the witnesses and, quite frankly, I personally failed to detect that, and I'm sure that the finders of fact detected that, as well, although, obviously, they weren't present during the testimony of the two victims. So, if you like, I'll give the court members an instruction about the accused's right to remain silent.... Do you want me to give that instruction?

> DC: Yes, Your Honor.

Thereafter, the court members were recalled and instructed not to draw any adverse inference from the appellant's silence. During his final argument regarding the offenses involving Kerstin L, the trial counsel again referred to the appellant's demeanor, arguing as follows:

> The accused calls the [L]'s at approximately 8 p.m., 17 April, and says, "Hey, what's happening?" "Hey, what's happening?" That's your first response after you've just been suspected of sodomy and indecent acts with Kerstin? And his concern? His concern goes back to demeanor. His concern was not for Kerstin. His concern was for his career. He was short. He was getting out. He wanted to get out before the gig was up. Again, I ask you to look and to think about his demeanor in the courtroom.

In his final instructions on findings, the military judge, *sua sponte*, repeated his admonition against drawing any adverse inferences from the appellant's failure to testify.

## II. OBSTRUCTION OF JUSTICE

### A. Sufficiency of the Specification

■ This court ordered briefs on the question whether the specification alleging obstruction of justice is sufficient to allege an offense. The specification alleges that the appellant—

> did, at Berlin, GE, between on or about 12 April 1989 and on or about 12 May 1989, wrongfully endeavor to impede an investigation being conducted by German Criminal Police and the Berlin Second Region Criminal Investigation Division (CID) office and wrongfully endeavor to influence the actions of Wolfgang [L] and Diana [L], witnesses in a child sexual abuse investigation against him relating to their daughter Kerstin [L], by talking to them on the telephone begging them not to press charges and that if they would withdraw their complaint he would tell them everything about the three sexual assaults and seek medical treatment.

This court ordered briefs because of concern whether "begging" a complainant not to "press charges" is, on its face, criminal conduct. After considering the briefs of counsel, we are satisfied that the specification, although inartful, is sufficient to allege every element of the offense, directly or by fair implication, and is sufficient to notify the appellant of the conduct against which he was required to defend. *United States v. Schwarz*, 15 M.J. 109, 111 (C.M.A. 1983), and cases cited therein.

B.  Sufficiency of the Evidence

■ This court also ordered briefs on the question whether the evidence is legally and factually sufficient to support a conviction of obstructing justice. Evidence is legally sufficient when a reasonable factfinder, viewing the evidence in the light most favorable to the prosecution, can find all the essential elements of the offense beyond a reasonable doubt. Evidence is factually sufficient when, after weighing the evidence and making allowance for not having personally observed the witnesses, the members of this court are convinced of the appellant's guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987).

■ The offense of "obstructing justice" under the Uniform Code of Military Justice is broadly defined to include "all instances of corrupt conduct intended to obstruct the 'due administration of justice'." *United States v. Bailey*, 28 M.J. 1004, 1006 (A.C.M.R.1989). Nevertheless, the conduct must be wrongful before this court can affirm a conviction. Manual for Courts-Martial, United States, 1984, Part IV, paragraph 96b(1); *United States v. Asfeld*, 30 M.J. 917 (A.C.M.R.1990), and cases cited therein.

■ In the case before us, the evidence pertaining to the obstruction of justice charge is uncontroverted. The appellant

had become a virtual member of Kerstin's family. The telephone conversation between the appellant and Mr. and Mrs. L was emotional on both sides. The appellant begged Mr. and Mrs. L not to "press charges," apparently under the mistaken notion that Mr. and Mrs. L had the legal authority to decide whether criminal action would be taken. He did not ask them to lie, nor did he threaten them, offer bribes, harass them with repeated telephone calls, or indulge in any other unlawful conduct. Had Mr. and Mrs. L acceded to the appellant's request, they would have done nothing unlawful. At most, they would have informed the appropriate authorities that they did not desire to pursue a criminal investigation of the appellant's conduct. We hold that the appellant's conduct was not unlawful. Accordingly, we hold that the evidence is legally insufficient to support a conviction of obstructing justice. Therefore, we must set aside the findings of guilty.[1]

## III.  DENIAL OF MOTION TO SEVER

■ Prior to pleas, the military judge denied a defense motion to sever the two offenses involving Adam from the remaining offenses involving Kerstin and her parents. The appellant now contends that the military judge erred. We hold that the military judge did not err.

Ordinarily, all known offenses should be tried at a single court-martial. A severance should be granted "only to prevent manifest injustice." Manual for Courts-Martial, United States, 1984, Rule for Courts-Martial 906(b)(10) [hereinafter R.C.M.]. Unlike the situation in *United States v. Haye*, 29 M.J. 213 (C.M.A.1989), the military judge in the appellant's case took extraordinary measures to protect the appellant from the "spillover" effect. In *Haye*, "[t]he evidence presented by the Government in its case-in-chief, its cross-examination of the accused, and its rebuttal was so merged into one that it is diffi-

---

1. Although not asserted as error, we note that the military judge's instruction on the elements of obstructing justice failed to include the element that the appellant's acts were wrongful. Neither party objected to the instruction. In

light of our holding that the evidence is legally insufficient, we need not determine whether the military judge's instruction prejudiced the appellant, nor need we determine whether the failure of counsel to object waived the error.

cult to distinguish its intended purpose." *Id.* at 215. In the appellant's case, the evidence pertaining to Adam was totally independent of the evidence pertaining to Kerstin. The incidents were factually dissimilar and two years apart. The military judge cautioned the court members against the spillover effect in his preliminary instructions:

> You'll see testimony in court about both of these victims; however, the evidence about one victim cannot be used to prove up the crimes against the other victim. They're two separate things. Again, you won't use the testimony or the evidence about one witness that testifies about one victim against the accused for the other offense—they're two separate matters—unless I give you instructions otherwise about how that might apply to each offense.

Both counsel followed up on the military judge's instruction. The trial defense counsel emphasized the need for separating the two cases by asking on voir dire:

> Did any of you read those charges and think to yourself, "Gee, this just couldn't have happened twice by accident. There must be something to it." Did any of you kind of have thoughts like that run through your mind when you read that charge sheet in front of you?

He received a negative response from all court members. In the same vein, the trial counsel structured his opening statement to portray the trial as involving two separate cases.

In essence, the military judge conducted a bifurcated trial. After both sides had rested on the merits, the military judge required that closing arguments be bifurcated. Counsel for both sides first argued the case involving Adam and then repeated the argument process for the case involving Kerstin. In his instructions on findings, the military judge repeated his admonition:

> Remember, also, what I told you up at the front of the trial: That is, in assessing the evidence, you may not use the evidence pertaining to Adam in your determination of the allegations pertaining to Kerstin and you may not use the evidence pertaining to Kerstin in your determination of the allegations pertaining to Adam.

When the military judge explained the elements of the offenses, he first addressed what he referred to as the "Adam allegations" and then addressed the "Kerstin allegations." Finally, the findings worksheet listed the offenses on separate sheets, further emphasizing that two separate cases were involved. We are satisfied that the military judge's precautionary instructions and the bifurcated presentation of the evidence, arguments, and instructions on findings were sufficient to protect the appellant from the spillover effect, and we hold that a severance was not required to prevent a manifest injustice. Accordingly, we hold that the military judge properly denied the request for severance.

## IV. SUFFICIENCY OF THE EVIDENCE OF INDECENT ACTS WITH ADAM

■ The appellant contends that the evidence is legally and factually insufficient to support a conviction of indecent acts with Adam. We disagree.

Adam's testimony was specific and convincing. He identified the appellant from a photograph several times. Adam's refusal to identify the appellant in court is readily understandable in light of his mother's admonition not to "see him" or talk to him. The court members found Adam believable, as do we. We hold that the evidence is legally and factually sufficient to support the appellant's conviction. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

## V. TRIAL COUNSEL'S COMMENT ON APPELLANT'S DEMEANOR

Finally, the appellant contends that the military judge failed to take adequate corrective action after the trial counsel improperly argued to the court on findings that the appellant's demeanor was "cold as ice" and referred to him as "the iceman."

The court members were instructed by the military judge as follows:

> There was some concern by the defense that the prosecutor alluded to the fact that the accused exercised his right to remain silent during the trial. That's, of course, not proper for him to do that so, if you understood his argument as saying that, you'll disregard that from his argument. Again, we all know the accused has the absolute right to remain silent. He doesn't even have to put on a case and, if he elects not to testify, you can't use that against him and I'll talk more about that in the final instructions.

During his instructions on findings, the military judge repeated his admonition against drawing any adverse inference from the appellant's failure to testify. The military judge did not address the question whether the court members could consider the appellant's "cold as ice" demeanor as evidence of guilt and neither party requested such an instruction.

■ The appellant's demeanor in this case was more subtle and ambiguous than the demeanor involved in many of the reported cases. *See United States v. Wicker*, 933 F.2d 284 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 419, 116 L.Ed.2d 439 (1991) and *United States v. Schuler*, 813 F.2d 978 (9th Cir.1987) (defendant laughing during trial); *United States v. Carroll*, 678 F.2d 1208 (4th Cir.1982) (defendant having animated discussion with defense counsel); *United States v. Wright*, 489 F.2d 1181 (D.C.Cir.1973) (defendant disrupting courtroom). Nevertheless, even comments on an accused's expressionless, impassive demeanor may be improper. *See Borodine v. Douzanis*, 592 F.2d 1202, 1210 (1st Cir. 1979) ("He's as calm as he can be, he never had a shred of remorse from the beginning right up until now.")

■ A trial counsel who comments on the demeanor of a nontestifying accused in his closing argument is "strolling in a minefield." *Douzanis*, 592 F.2d at 1209. Comments on a non-testifying accused's demeanor are objectionable on three grounds: (1) they argue facts not in evidence; (2) they violate Military Rule of Evidence 404(a) by using character evidence solely to prove guilt; and (3) they violate the fifth amendment by indirectly commenting on the accused's failure to testify. *Schuler*, 813 F.2d at 980–81.

■ In this case the trial defense counsel objected to the argument only on the ground that it was a comment on the appellant's silence. The military judge gave a curative instruction on the spot and repeated it during his instructions on findings. We are satisfied that any improper reference to the appellant's failure to testify was cured by the military judge's instruction.

■ Since the trial defense counsel did not specifically challenge the argument for arguing facts not in evidence or violating Military Rule of Evidence 404(a), we hold that the defense objection was not sufficiently specific to include these two grounds, and that, accordingly, those bases for asserting error were waived. R.C.M. 919(c). We hold further that, under the facts of this case, the improper argument did not rise to the level of plain error on these two grounds.

■ In concluding that plain error did not occur, we note first that the impact of the trial counsel's argument was mitigated by the military judge's instruction that it was improper. We note further that, with respect to the offenses involving Adam, the court members specifically excepted the allegations of lustful intent and sexual gratification from their findings of guilty. Their findings indicate that they focused on the testimony rather than the arguments of counsel, and found the appellant guilty only of those acts described by Adam, and not guilty of those elements involving depraved character to which the "iceman" argument referred. With respect to the offenses involving Kerstin, the combination of Kerstin's in-court testimony, corroborated by the appellant's admissions to Kerstin's father, constitutes overwhelming evidence of guilt. We are satisfied beyond a reasonable doubt that the improper reference to the appellant's "cold as ice" character had no effect on the findings. Accord-

ingly, we hold that the trial counsel's reference to the appellant's "cold as ice" demeanor was not plain error.

We have considered the issues personally asserted by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and have determined that they are without merit.

The findings of guilty of the Additional Charge and its Specification (obstruction of justice) are set aside. The Additional Charge and its Specification are dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted above and the entire record, the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for three years and six months, forfeiture of all pay and allowances, and reduction to Private E1.

Judge CREAN and Judge HAGAN concur.